Mr. Peck, Mr. Montoya, Mr. Washington, Mr. Cox, can you both hear me? Yes, sir, your honor. Mr. Cox, you may proceed. Thank you, your honor. Good morning and may it please the court. I would like to note I'll reserve three minutes for rebuttal and we'll keep a watchful eye on the clock. By way of introduction, my name is Jesse Cox and I'm counsel for appellants, Anthony Montoya, Michael Johnson, Brentman, John Fry, and Brad Carrington, a collection of former and current Orange County Sheriff's Department deputies. Before the court today, advocating for reversal of the district court's order denying appellants qualified immunity stemming from a fatal encounter with decedent Paul Mono that occurred on February 6th of 2018. In that connection, there are two overarching issues on appeal. First, whether the district court erred in denying appellants qualified immunity on appellee Susan Peck's excessive force claim where two appellants, Montoya and Johnson, used reasonable force and appellants Lynn, Fry, and Carrington were not integral participants in either use of force. And secondly, whether the district court erred in denying all appellants qualified immunity on appellee's substantive due process claim where no deputy acted with deliberate indifference or a purpose to harm unrelated to a legitimate law enforcement objective. Critical to the analysis on both of these issues is whether there was any clearly established law prohibiting any of these deputies from acting as they did in the circumstances they faced. And as the issues outlined here, appellants submit the short answer is yes, the district court did err. It erred in finding that there were tribal issues of fact as to whether decedent Mono presented an imminent threat, such that deputies Montoya and Johnson's use of deadly force was not reasonable as a matter of law. Can I ask you to stop there and what do you understand to be the scope of what we're allowed to review? Because under Johnson, we can't review evidentiary sufficiency. So the district court thought that there were tribal issues of fact on whether, you know, whether he was near the gun, whether he was moving towards the gun or away from the gun, whether he brandished the gun. And we aren't able to review that, are we? The short answer, Your Honor, is no. We are and we are not here asking the court to review sufficiency of evidence. We recognize that that would lie outside the jurisdiction of this court in an interlocutory appeal. If we accept then that there's a tribal issue or that a jury could find or the district court thought a jury could find and we cannot review its conclusion that a jury could find that he wasn't going towards the gun. He was, in fact, moving away from the gun. He never brandished the gun. Why? Why would it be reasonable to use deadly force against someone just because he's in the same room as a gun if he's not moving towards the gun or threatening to pick up the gun? Well, Your Honor, I think that actually the undisputed facts in this case, facts that Appellee Ms. Peck has said she has no quarrel with, do indeed show that Mr. Mono presented the kind of threat that the deputies say he did on the day of this incident. And as our district court in this case has already recognized, whether or not those nondisputed facts should entitle these deputies to qualified immunity is a question of law that is most certainly appealable and for which this court has jurisdiction. And that is what we are here to focus. Before we can get to the question of qualified immunity, we have to decide whether or not there was a constitutional violation here. And the district court thought that on the basis of these contested facts, a jury could find that the use of deadly force was excessive. So wouldn't that preclude us from ruling that qualified immunity should attach? No, Your Honor. And that is because many, if not all of the district court's facts, those on which it relied in determining a dispute effect existed are immaterial. And that's a point that we raised. But if there's a dispute over whether or not the seizure in the form of using deadly force that unfortunately killed Mr. Pack, if there's a disputed issue of fact over that, how can we declare that no reasonable jury could find a constitutional violation of the Fourth Amendment? Because, Your Honor, what we're asking the court to do is look at those facts that are undisputed and with those that the district court has determined, raise that dispute, agree with the appellants that those facts are immaterial. They actually, when applied to the substantive law, do not change the outcome of this case. Judge Miller asked you about whether or not the evidence could be interpreted to show that he wasn't near the firearm, that he hadn't brandished it. And if the jury so finds, then would it be objectively reasonable for an officer to employ deadly force if Mr. Peck was moving away from the gun and not brandishing it or threatening to shoot the other officers? I believe it would depend, Your Honor. We recognize that there's case law out there in this circuit that says deputies, officers cannot shoot an unarmed man who does not present a threat. We recognize, too, that there's authority out there that says mere possession of a weapon isn't necessarily enough to justify deadly force. But in this case, on the undisputed record, those facts that Ms. Peck has agreed are undisputed. Mr. Mono indeed presented a threat, and he did so in several respects. Initially, he did so based on his undisputed behavior prior to the shooting. He presented agitated, screaming at deputies, cursing at them, showing his backside up against the window, giving them a middle finger, screaming things like, if you come into my home, I will shoot you. All of that is undisputed. We then move closer in time to the shooting, after which point deputies have observed a firearm within reaching distance of Mr. Mono. Again, facts that are undisputed. There is no question here about whether or not there was a gun in this residence. It is certain. It is undisputed. That gun was there. The deputies have also put forth evidence. So your position is that it's irrelevant whether or not he was brandishing the weapon at the time the officers fired. No, Your Honor. Based on all the other circumstances that you just outlined. Let me clarify. I do not believe under controlling circuit precedent, it was necessary for Mr. Mono to pick up and point that weapon before the deputies were allowed to use protective gunfire. I believe that it could be. It is irrelevant, as for the qualified immunity analysis, that no reasonable jury could find based on his erratic behavior, the mooning, the threats to kill and so on. That it was objectively unreasonable for an officer to employ deadly force, regardless of whether or not he went for the gun. Not quite, Your Honor. I believe that it is critical here that Mr. Mono move toward that weapon. And again, that's a fact that is undisputed. And it's a fact that's undisputed. That's a fact that is disputed. The district court thought that there was a dispute effect on whether he was before the gun. And there's one witness who said he was the neighbor that he had seen him moving away from him. So how can you say that's undisputed? Well, I don't dispute, Your Honor, that there's a witness who says that he moved away, that he saw Mr. Mono move away from the gun. But that testimony was with respect to Mr. Mono's movement seconds before shots were fired. And that same witness has nothing to say about the moment shots were fired, where Mr. Mono was located, what he was doing at the moment shots were fired. Now, with respect to Mr. Mono's movements toward the gun, there is evidence in the record that that fact he moved toward the firearm is undisputed. I can point the court to the excerpts of record, volume 8. It is page 1886. And it concerns undisputed fact number 47, that at least three deputies saw Mr. Mono move toward that weapon. Mrs. Peck's response to that fact, undisputed. And so... I guess I have two questions based on that. The first is just an observation. I don't read, I think the neighbor was Mr. Berman. I don't read Berman's testimony quite the same way you do. And it seems to me quite reasonable to infer from what Berman was saying that he was moving away at the time. But the more fundamental question is why do we get to decide that? The district court thought that Berman created a disputed fact. And maybe that's right, maybe that's wrong. But that's a question of evidentiary sufficiency that we can't preview, isn't it? No, Your Honor. And it's because it's a question of materiality. I'm not asking this court to weigh the sufficiency of it. I'm just asking to consider its materiality to this case. And that, Your Honor, as we put in our statement, our standard of review in our statement of jurisdiction, is a legal question squarely within the ambit of this court's jurisdiction. Is that fact material to the outcome of this case? We submit it's not. And we submit it's not because of time that passed between Mr. Berman's observation of Mr. Mono and the time shots were fired. And the fact that Mr. Berman has nothing to say about what Mr. Mono was doing at the time shots were fired. This circuit's precedent, the Supreme Court, both hold that that is the moment in time that we must focus on when judging the reasonableness of deadly force. And again, Mr. Berman is silent on that. And so as we've argued in our... Did the police announce their presence and ask him to put his hands up or anything like that? Your Honor, we submit that law enforcement most certainly announced their presence. They had an exchange with Mr. Mono, identifying themselves as the Sheriff's Department. Again, well, I guess for the first time, there were five uniformed officers, deputies outside of this residence as well. Of course, it's a feel-good fact to know that as they arrived, they said, police, we're here, we are the Sheriff's Department. But those uniforms in and of themselves, a presence deemed in law enforcement communities as command presence, that alone is intended to communicate. We are law enforcement and we're here. But again, to answer the court's question, yes. He asked, using the language cited in the case, he asked, who the fuck are you? To which the response was, we're the Sheriff's Department. Counsel, could you turn to the question of integral participation by the officers on the perimeter? Gladly, Your Honor, and thank you for turning our attention there. We submit that these three deputies cannot be held liable as integral participants in a use of force. And that's for several reasons. First of all, they weren't themselves fundamentally involved or instrumental in either of the shooting deputies' use of deadly force. They didn't encourage any of those deputies to pull the trigger. They didn't order them to. They didn't instruct them to. They didn't provide them the means to use deadly force. They were merely there. And secondly, there simply is not, in our view, clearly established law that predated this incident that told these three deputies under these circumstances, you are likely to be held liable for excessive force should one of your other partners indeed use force. The district court cited several circuit opinions that it believed informed the integral participant analysis and was enough to hold these three deputies liable. But none of them are factually analogous to the case that we have here today. One of them, called Blankenhorn v. County of Orange, involved a plan where deputies came together in a concerted effort to carry out a search operation. And each person had a role. And those roles built off one another until ultimately a use of force was employed that was held unconstitutional. That didn't happen here. There was no plan for anybody to use any kind of force. Another case called Boyd involved an individual, and I apologize because I may have now just mixed these two up. I believe the case I just described for the court was Boyd. And then in Blankenhorn, it was an arrest that involved a hobble restraint where officers initially used force in the form of applying handcuffs and a punch that then allowed another officer to apply the hobble restraint. But for that punch and handcuffs, the other officer wouldn't have been able to apply the hobble restraint. And so all officers were held to be integral participants. We don't have that here. We don't have any but-for causation for these three non-shooting deputies that ties them to Mr. Mono's injury. I apologize, Judge Schroeder, it looked like you had a question. I just thought it seemed to me that the district court was troubled because there was no plan. They all simply surrounded the house, armed, with a man that was obviously a little bit addled. And that they were acting together in doing that. That seemed to me what the district court was saying. Do you disagree with that? In part, Your Honor. I agree that there was no plan. There was no set plan as these five deputies approached the home. And in the armchair of 20-20 hindsight, would we like our law enforcement to have some sort of put-together plan, a step-by-step approach as to how to deal with a dangerous situation? Or talk to witnesses. Which they did. But the fact that there isn't a plan here, while it may trouble the district court with respect to the ultimate use of force, it actually cuts against holding these other deputies liable as integral participants. These are the cases that have come out of this circuit about integral participants. They discuss having a plan. Or at least taking action that everyone knows about and no one objects to. And again, that didn't happen here. There are 20-20 opinions. There's one out of the district court of Idaho that addresses this very issue. It's called Williamson v. Edgeley. And in similar circumstances, it holds that the non-shooting deputies who had no idea deadly force was about to be employed and did nothing to cause shooting officers to use deadly force could not be integral participants. And this court, as recent as August of 20-20 in Reynaga-Hernandez v. Skinner, has announced that it has yet to really define the minimum standard by which one can be held liable as an integral participant. And if it's true that that standard has not been set as of August 20-20, then it must also necessarily be true that the law was not clearly established in February of 2018 sufficient to give these non-shooting deputies notice that what they were doing that day would subject them to liability for excessive force. Mr. Cox, you're over your time. We'll give you a little time for rebuttal. And we'll hear now from Mr. Washington. Understood, Your Honor. Thank you. Thank you, Your Honor. May it please the court. My name is David Washington and I represent L.E. Susan Peck. There are three straightforward district court findings that this court should affirm. First, the district court correctly found that it's a violation of clearly established law for officers to shoot and kill an unarmed, mentally ill, visually impaired elderly man in his own home. And on this record, a reasonable jury could find that that's what happened here. Second, the district court correctly found that it's a violation of clearly established law for officers to actively participate in unnecessary and prolonged standoff that directly and foreseeably results in a lethal shooting. And on this record, a reasonable jury could find that that's what happened here. Counselor, with regard to that second point, I'm a little troubled by your theory that the officers who were containing the perimeter, which obviously contained a very dangerous individual or potentially dangerous individual, could somehow be integral participants in the decision to employ the use of deadly force. As I understand your expert's testimony, one of the things that your expert said they needed to do was to contain the scene and call in more specialized units and wait for them to arrive. Isn't that what the non-shooting deputies did when they took up positions around the house? It's not what they did, Your Honor. Each of them pressed up against the window. None of them formulated a plan. They didn't form a perimeter. And, you know, I think an important fact here that wasn't discussed by Mr. Cox was that Mr. Mono was severely visually impaired. And on top of that, Mr. Cox stated that it is undisputed that the officers identified themselves. That's not the case. It is in dispute. And when you have someone who's severely visually impaired, and who's obviously so because he's walking around with a red tip cane, sunglasses inside, under any standard it's hard to imagine a tighter integral participant causation than a shooting resulting from that kind of standoff when all these officers know this guy doesn't know who they are. Well, I'm not so sure I can agree with your characterization. There was testimony that he was actually looking towards the individuals that he was addressing when these commands were being given, and that the officers thought he might have some problems, but that he was aware of the fact that there were people outside. So I think the jury probably will have to resolve whether or not he was totally visually impaired or only partially. But I'm still a little troubled by your answer, because it seems to me that the non-shooting deputies did what I would expect them to do, which is to take up positions outside the house where they could see in to determine what was going on and then take further steps at that point. Where's the constitutional violation there? That's where I'm having a problem finding for the non-shooting deputies. They didn't take positions where they could see in to determine what was going on. They didn't find out the phone number. They didn't follow their sergeant's order to set up a perimeter. They knew they had a CERT team en route. They did nothing there. And I think the fundamental issue here is that these officers, and a jury will have to determine whether or not these officers reasonably believed that Mr. Mono was visually impaired or knew who they were at all. And I think that that answers the question here, because if you have officers pressing up, variously drawing their weapons, pressing up against windows where a man, where they know or should have known, a man doesn't know who they are, a pretty foreseeable result of that is going to be this exact kind of escalation that happened here. But it's not a foreseeable result that there will, I mean, maybe, I guess I'll grant you for purposes of this question that it's foreseeable that it might result in a shooting. It's not foreseeable. I wouldn't think that it would result in a constitutional shooting. Right. So what is it that would have put the non-shooting officers on notice that they were in a situation where unless they did something, and it's still a little unclear to me what they should have done, but unless they did something, their fellow officers were going to commit a Fourth Amendment violation by unjustifiably shooting somebody. What would have alerted them to that? We can look at Gutierrez-Rodriguez versus Cartagena, which is out of the First Circuit, but 882 F2nd 553. In that case, there were four officers who did a jump out on a vehicle, and one of the officers fired on the occupant of the vehicle who became a paraplegic. The First Circuit held that the commanding officer at the scene, where in this case should have been Frey, along with the other officers who didn't fire their weapons, were integral participants in the third officer's shooting of the plaintiff. And this was so because for the commanding officer, he directed and participated in the acts that led to the shooting. And as to the other non-shooting officers, they surrounded the plaintiff's car with their weapons drawn alongside the shooter. And I think that the gravamen of that case is you have a situation where these officers are operating in lockstep, and they're not following policy. They're not waiting on a team that's already en route. And in this case, unlike in Gutierrez-Rodriguez, there's reason to believe that a reasonable officer would not believe that Mr. Mono knew who they were. Does your argument then amount to, or if we were to accept your argument, would we be establishing a rule that if you're a police officer and you deviate from appropriate police practices, even in a way that's not itself a constitutional violation, you thereafter are essentially strictly liable for any use of excessive force by other officers that you might be accompanying? Isn't that the rule we'd be creating? No, I don't think it is, because you wouldn't be creating any new rule. What would be happening here is you would simply be saying where an officer's conduct and acts and failures to act foreseeably result in an unconstitutional shooting, then there's a violation. Counsel, I had a case years ago involving an individual in a public housing project who stabbed an eviction deputy with a cavalry sword and killed him, and 104 police officers responded to that incident. Are you saying that all 104 could be liable under your theory if they didn't have a plan? Sorry, Your Honor. Without more information, I couldn't answer that question. I mean, 104 officers, you have to look at what the individual officers are doing. In this case, we know what each of these officers did and what they didn't do. Well, they took up positions that they were surrounding, I guess, the entrances and exits from the house and trying to look in to see what was going on inside. And I'm still having a hard time finding a constitutional violation there. And I agree with Judge Miller's characterization that, while it may very well be theoretically foreseeable that a shooting might occur, I don't see anything in this record suggesting that any of the non-shooting officers thought that was going to happen until the shooting actually occurred. Your Honor, I don't think that the question is whether or not these officers personally thought that it would happen. I think the question is whether or not it was foreseeable to a reasonable officer. And we would submit that based on Gutierrez v. Rodriguez, Hall v. Shipley, and other precedent, it was foreseeable. But isn't part of the officer's responsibility for those who are outside is to try and gather as much information as possible as to what's going on inside? And why is it unreasonable for them to be looking through the window to see what Mr. Mana was doing based on the nature of the call that they're responding to? It's unreasonable because they had multiple other options at their disposal that they didn't use. So I'm not sure what the logic would be behind having five officers. Your theory is that they basically should have backed off, I guess, and continued to maintain surveillance on the residents. And I take it there's a CERT team. Is that like a SWAT team? It's a critical incident response team, yeah. Okay, so that was the team that was being gathered together and sent to the scene. Yes. I wouldn't categorize it as exactly the same as a SWAT team. But it's a highly trained team to deal with barricaded suspects. Yes. Okay. And why would a reasonable officer think they shouldn't be gathering information as much as he can see about what's going on inside the house in order to brief the team when it gets there on what they've got? I think a reasonable officer would want to do that, but that's not what they did here. And what I mean by that is you have one officer looking through the window. That's one thing. You have five looking through the window when the only person who was inside the house that day is standing right outside. These officers don't think that person's in harm's way. And yet they don't speak to that person. That's the tragedy here, isn't it? That Heflin knew that this guy wasn't really a danger. And apparently they didn't talk to Heflin. And Metzler called the police before he heard everything that was going on inside the house or something like that. Yes, Your Honor. The officers knew that Heflin was the only person who'd been inside the house that day and chose not to speak with her. Yeah. Was the gun still in a holster when people finally went into the house? Yes, Your Honor. The gun was recovered in a holster unloaded. Is there any evidence in the record that the officers knew the gun was not loaded before they fired? Aside from the fact that it was holstered, I think the answer to that question is sort of two parts, right? So in terms of what they saw in the moment, if we were to believe their testimony, which is I think the opposite of what we're supposed to do here, but if what they saw in the moment was a holstered gun, that's the information that they had. However, they also knew that the only person who'd been inside the home that day was standing outside ready and willing to talk to them, and they didn't speak with her. But even if they'd talked to her, wouldn't she have confirmed that he'd been waving the gun around and threatening to kill Mr. Metzler with it prior to the 911 call? She would have confirmed that he'd waved the gun around and said something to the effect of, if Mr. Metzler comes in, I'll shoot him. I don't want him in my house. And then isn't the evidence in the record that he also threatened to shoot anybody else who came into the house? I don't believe that that is an undisputed fact, Your Honor. Well, the officers testified that he did that, and apparently Mrs. Peck has some memory problems, so she can't refute it. And I don't know that Mr. and Mrs. Berman, I think they said he was acting insanely, like a wild man. Yes, Your Honor. Why would reasonable police officers think that the situation was not dire, that this was an emergency? Luckily, we have statements from Officer Frey, for instance, that he didn't think it was dire, that he didn't think there was a threat to the people standing just 100 feet away outside. Then why did they call a CERT team if they didn't think it was an emergency? That's a question of fact, I think, for the jury. I'm trying to understand your theory about what it is that the non-shooting officers have done that's a constitutional violation. I mean, you may not, in hindsight, like the fact that they didn't have a better-developed plan, but I don't see deliberate indifference here to the constitutional rights of Mr. Mono from trying to figure out what they have when they arrive on the scene. And it's a pretty chaotic situation with this guy behaving so erratically and threatening people. When it comes to deliberate indifference, where officials have the opportunity to make unhurried judgments, deliberate indifference may shock the conscience, particularly where the state... How much time elapsed between when the first officer arrived on the scene and when the shooting took place? 10 to 20 minutes, as determined by the district court. However... Don't we know from the radio logs exactly how much time elapsed? I thought it was closer to 10 than 20. Unfortunately... We've got the initial dispatch, the arrival, and then a report that shots have been fired. Unfortunately... Well, the officer's body-worn audio was not functioning. We do have some indication from the dispatch logs as to how long the encounter occurred. And what's the time lapse from the arrival of the first officer until the report of shots being fired? I don't recall exactly, but I believe it's between 10 and 14 minutes, Your Honor. Okay, so closer to 10 than 20. I mean, on any... Whatever the time is, it's not a lot of time, right? It seems like the officer arrives, and there are a lot of different things that they could be doing at that moment. They could be keeping an eye on the person that they've just had a report is acting erratically and may have a gun. They could talk to some of the witnesses. There are other things we can imagine that they could do. I'm troubling to see where we get the authority to say that the Constitution requires people who didn't shoot anyone to follow some particular set of steps and a particular priority in this very limited time period that's available to them on pain of being found liable in the event that somebody else shoots someone. How do we get all of that out of the Fourth Amendment? Well, Your Honor, to speak to your first point, there's a dispute as to whether or not these officers even knew that Mr. Mono had been waving a gun inside the home that day. Montoya, for instance, didn't even know whether or not he had probable cause to enter the home, and it's not established on the record as an undisputed fact that Officer Frey spoke with the other officers or that the other officers heard him state anything to the effect of the gun had been waved around that day. Do we have a copy of the radio dispatch? We do. Okay, and what did the dispatcher tell the responding officers in response to the 911 call by Mr. Messick? The dispatcher said the informant's client is inside threatening to shoot the informant. Informant is standing outside. Informant hasn't seen a gun but knows that the client owns them. And then there is a real estate agent inside the residence, client not threatening agent. And then after that, informant did not see the subject yesterday. It was the real estate agent who saw the firearms. And then after that, from Officer Frey, I contacted the real estate agent, which he didn't do. She is not inside the residence at this moment, saying the male subject waved his gun around at her while they were talking. And you say that didn't happen? He never had that conversation? Correct. According to his own testimony, he didn't speak with Heflin at all. He only spoke with Metzler. Okay. So it was basically Metzler who told him about Mauna waving the gun around and threatening to kill her. And Metzler didn't understand the situation. Correct. And at that time, Officer Frey knew that Heflin was the only person who had been inside the home that day. Okay. So I guess I have the same concern that Judge Miller has. Why does this not fall into Tennessee versus Garner events that are tense, uncertain, and rapidly evolving? Because they had this 10-minute window where they're standing there, and Mr. Manos is just clearly emotionally disturbed at one point, pulling his pants down, spreading his buttcheeks on the window. He never threatened the officers once, and that's a fact that the district court found. And you don't think that that evidence fits into tense, uncertain, and rapidly evolving? It doesn't sound like the situation is quiet on arrival to me. I don't, and the officers didn't either. Frey, halfway into the encounter, radioed, he's refusing to come out, refusing to let us in. We're at a stalemate. And they think he may have a gun inside, and he's behaving erratically. Why is this not a dangerous situation that the officers are facing? Partially because some of the officers don't know whether or not he's waving a gun inside, but also he was seen waving a gun inside that day. Officer Frey believed it had happened in the morning. And at that point, when he radioed that, they'd had an opportunity to observe him for some time, about four or five minutes, and he was just ambling about with a red-tipped cane, yelling nonsense, not threatening anyone. You're characterizing the evidence differently than the way I read it in the record. I would not characterize Mr. Mono as being calm, cool, and collected when the officers were observing his behavior. I 100% agree with you. All right. Okay. I think I understand your position. Thank you. Thank you, Your Honor. Can you pass your time unless there's some more questions? All right. Thank you, Mr. Washington. Mr. Cox, we'll give you two minutes for rebuttal. Thank you, Your Honor. First of all, I'd like to speak to the conversation that Judge Tong was having with counsel just before day broke. We certainly contend that Mr. Mono presented a threat at the time force was used, and it may be, well, let me back that up.  And whether he presented a threat from a standpoint that doesn't account for the dynamic nature of the situation, that he may not be a threat in one moment and then within an instant, because of his actions, because of his words, becomes that threat that warrants deadly force. The court is right in its observations of the record. This incident lasted a matter of 10 minutes. It's not a lot of time. And for the majority of that time, the officers were doing, the deputies were doing what they could to assess the situation and keep it contained. It wasn't until Mr. Mono took action, made statements. You want to see my gun? I'll show you my gun, which I don't know how it can be considered anything other than threatened and then move toward it again,  And now to speak to judge Tomans concerns as to the integral participation doctrine. I want to highlight for the court that just four months ago, the Supreme court came out with two opinions, Rivas Vegas versus Cortez Luna and city of Tulaqua versus bond that reaffirmed the vigor and vitality of the qualified immunity doctrine. And importantly here reaffirmed the burden that is on plaintiff to come forward with a factually analogous case that says in these circumstances, it is unlawful here to use deadly force. And with respect to the integral participation doctrine, your honors, we certainly believe plaintiffs have not carried that burden here. We're not even sure that there is a case that exists because the ninth circuit hasn't even clearly defined the standard by which one can be held liable for integral participation. And that's true as of August, 2020, two and a half years after this incident happened. Unless the court has any other questions, I will respectfully submit and thank the court for its time. Thank you. Thank you, Mr. Cox. We thank both counsel. Oh, I'm sorry. No, I just wanted to thank them both. I thought it was fine. I agree. We thank you both for your helpful arguments this morning. The case. Thank you. Thank you.
judges: SCHROEDER, TALLMAN, MILLER